GARMAN TURNER GORDON LLP
WILLIAM M. NOALL
Nevada Bar No. 3549
E-mail: wnoall@gtg.legal
GABRIELLE A. HAMM
Nevada Bar No. 11588
E-mail: ghamm@gtg.legal
MARK M. WEISENMILLER
Nevada Bar No. 12128
E-mail: mweisenmiller@gtg.legal
650 White Drive, Suite 100
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*[Proposed] Attorneys for Debtor*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>GUMP'S HOLDINGS, LLC,<br><br>Debtor. | Case No.: BK-S-18-14683-leb<br>Chapter 11<br><br>Joint administration requested<br><br>Hearing Date:  **OST REQUESTED**<br>Hearing Time:  **OST REQUESTED** |

### DEBTORS' MOTION FOR ORDER AUTHORIZING MAINTENANCE OF PREPETITION CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS; AND GRANTING RELATED RELIEF

Gump's Holdings, LLC, Gump's Corp., and Gump's By Mail, Inc. ("collectively, "Debtors"),[1] debtors and debtors-in-possession, hereby respectfully submit this motion (the "Motion") for an order, pursuant to Sections[2] 105, 363(c)(1), 1107(a), and 1108, and Local Rule 4001(e), authorizing Debtors to maintain their prepetition Cash Management System and Bank Accounts (as those terms are hereinafter defined).  Substantially similar motions have been filed in each Debtors' Chapter 11 Cases.

---

[1] Contemporaneously herewith, each Debtor has filed an application for an order jointly-administering the Chapter 11 cases, with Gump's Holdings, LLC as the lead case.

[2] Unless otherwise stated, all references to "Sections" herein shall be to the Bankruptcy Code appearing in Title 11 of the U.S. Code; all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to a "Local Rule" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Nevada.

This Motion is made and based upon the following Memorandum of Points and Authorities, the omnibus declaration of Tony Lopez in support of Chapter 11 petitions, first day motions, and other relief (the "First Day Declaration"), the declaration of Tony Lopez filed herewith (the "Lopez Declaration"), the papers and pleadings on file herein, judicial notice of which is hereby respectfully requested, and the argument of counsel entertained by the Court at the time of the hearing of the Motion.

This Motion is also made and based upon the agreement dated as of August 5, 2018 (together with all exhibits thereto, the "Agency Agreement")[3], by and among a contractual joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Agent"), Debtors, and Debtors' senior lender, Sterling Business Credit, LLC ("Sterling"). The Agency Agreement is the subject of Debtors' *Motion for Order (A) Approving Agency Agreement, (B) Authorizing and Approving Store Closing Sale Free and Clear of All Liens, Claims, and Encumbrances, (C) Granting Liens, and (D) Granting Related Relief* (the "Agency Agreement Motion").

This Motion is also made and based upon Sterling's agreement to provide certain debtor-in-possession financing in accordance with and under the conditions provided in the *Emergency Motion for Interim and Final Orders (A) Authorizing the Debtors to Obtain Limited Post-Petition Financing, (B) Granting Liens and Providing Administrative Expense Status, (C) Authorizing the Debtors' Limited Use of Cash Collateral, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, and (F) Granting Related Relief* (the "DIP Motion") and related budget (the "Budget"), as approved by order of the Court (such order, the "DIP Order," and such financing, the "DIP Financing").

## I.
## PERTINENT FACTS

**A.    Background of the Debtors.**

1.    On August 3, 2018 (the "Petition Date"), each of the Debtors commenced a

---

[3] All capitalized undefined terms used herein shall be ascribed the definitions in the First Day Declaration and Agency Agreement Motion as applicable.

1   voluntary case under Chapter 11 of the Bankruptcy Code, commencing the chapter 11 cases (the

2   "Chapter 11 Cases").   Contemporaneously with the filing of the voluntary petitions, Debtors

3   filed an application for an order to jointly administer the Chapter 11 Cases, with Holdings

4   denominated as the lead case.

5        2.        Established in 1861 by the Gump family as a frame and mirror shop, Gump's

6   expanded its offerings in the late 19th century to sell moldings, gilded cornices, and European art

7   to those made wealthy by the California Gold Rush.   After rebuilding following the 1906

8   earthquake, Gump's began selling fine rugs, porcelain, silks, bronzes, and jade imported from the

9   Far East, ultimately becoming a distinctive luxury home furnishings and décor retailer known for

10  its fine art, jewelry, antiques, and personalized service.   Because Gump's specializes in unique,

11  one-of-a-kind items, it does not have any real direct competitors.  See First Day Decl., 7.

12       3.        Retail operates the flagship Gump's department store at 135 Post Street near

13  Union Square in San Francisco, California (the "Store"), which also houses the Debtors'

14  corporate offices.  See id., ¶ 8.

15       4.        With certain exceptions, "direct to consumer" sales, consisting of catalog and e-

16  commerce sales, are fulfilled from the company's distribution center located at 10400 Marina

17  Drive, Olive Branch, Mississippi, which is operated by Direct.   Direct also feeds inventory to the

18  Store in San Francisco.  See id., ¶ 11.

19       5.        Sterling Senior Revolving Credit Facility.Retail and Direct, as borrowers (the

20  "Borrowers"), Holdings, as Guarantor, and Sterling Business Credit, LLC ("Sterling")[4] are

21  parties to that certain Loan and Security Agreement, dated as of December 29, 2015, for a

22  revolving credit facility of up to $15,000,000 (as amended, the "Prepetition Loan Agreement"

23  and together with accompanying ancillary documents, the "Prepetition Loan Documents").  First

24  Day Decl., ¶¶ 13-19; Exs. 1 – 8.

25       6.        As is customary in asset-based lending, borrowings under the Prepetition Loan

26  Agreement are determined by amounts available pursuant to a borrowing base calculation, which

27

28

---

[4] While the original lender party to the Loan and Security Agreement was named NewStar Business Credit, LLC,
but entity changed its name to Sterling Business Credit, LLC on or before March 2016.

is based on percentages of eligible inventory and receivables, in each case subject to reductions for applicable reserves.[5]  Under the terms of the Prepetition Loan Agreement, the Borrowers are jointly and severally liable for all of the obligations incurred under the Prepetition Loan Agreement, which are also guaranteed by Holdings.  Id. at ¶ 14.

7.    Pursuant to the Prepetition Loan Agreement and the Patent, Copyright and Trademark Security Agreement dated December 29, 2015, as security for the Borrowers' payment and performance of the Prepetition Loan Obligations (defined below), Sterling holds a security interest and lien on substantially all of the current and future assets of the Borrowers, including, but not limited to, inventory, accounts receivable, general intangibles, equipment, trademarks, trade names, business names, service marks, logos, and certain related intellectual property (the "Trademark Collateral"), copyrights, copyright licenses, domain names, and proceeds from any of the foregoing, subject to certain exceptions and permitted liens (collectively, the "Borrower Collateral").  Id. at ¶¶ 16-17; Exs. 1, 5.

**B.    Debtors' Cash Management System, Bank Accounts, and Accounting Programs.**

8.    Debtors have one centralized cash management system (the "Cash Management System") to collect and transfer funds generated by their operations and sweep the funds to Sterling.  Sterling then advances funds to the Debtors' operating account under the Credit Facility.  The Debtors then use these advances to operate their business.  As is typical with most large corporate enterprises, in the ordinary course of their business, Debtors utilize the Cash Management System to efficiently collect, transfer, and disburse funds generated through Debtors' operations.  See Lopez Decl., ¶ 74.

9.    Debtors have five (5) bank accounts, all of which are with Union Bank (the "Bank Accounts").  Union Bank is an "authorized depositor".  One of the Union Bank Accounts is an operating account, ending in 628 (the "Operating Account").  Prepetition, the Operating Account was used to make payments in connection with Debtors' point of sales system to cover company

---

[5] The borrowing base is based upon 1) eligible accounts receivable with advances of up to 85% of the net amount of eligible credit card and house account receivables not more than 90 days from invoice date or 60 days from the due date, and ii) up to the lesser of 85% of the net orderly liquidation value of inventory value based upon an acceptable appraisal or up to 80% of eligible inventory based upon the lower of cost or market value.

checks and wire transfers.  Postpetition, the Operating Account will be Debtors' primary demand deposit account for making payments due from the Debtors in possession under their Budget. Prepetition, the Operating Account received only advances from the Credit Facility. Postpetition, debtor-in-possession financing payments from Sterling, together with all payments made to Debtors, including those identified in paragraph 11 below, shall be deposited in the Operating Account.  See id., ¶ 75.

10.    The second Bank Account is a blocked collection account, ending in 602 (the "Collection Account").  Prepetition, all accounts receivable, including Credit Card Receivables (defined below), were deposited in the Collection Account.  Prepetition, pursuant to the Credit Facility, Sterling caused a daily sweep of funds from the Collection Account and applied the swept funds to the loan balance under the Credit Facility (the "Prepetition Daily Sweep").  Such sweep will continue until the Agency Agreement has been approved by the Court and the Closing Sale (as defined in the Agency Agreement) commences.  At such point, under the Agency Agreement, the Agent may sweep the funds from the Collection Account daily and may sweep the Credit Card Receivables daily, or may have such funds and Credit Card Receivables directly deposited into a separate Agency Account, in accordance with the Agency Agreement. See id., ¶ 76.

11.    Once the Agency Agreement is approved by the Court, the following additional types of payments shall also be deposited directly into the Operating Account:

(i)  Debtors' share of the Initial Guaranty Payment;

(ii) Debtors' share of the remaining Guaranteed Amount after payment of Sterling's secured claim, except as otherwise agreed between Debtors and Sterling in writing;

(iii) Debtors' Sharing Amounts under the Agency Agreement after payment of Sterling's secured claim, except as otherwise agreed between Debtors and Sterling in writing;

(iv) Debtors' share of proceeds from sales of the Merchant's Consignment Goods under the Agency Agreement;

(v) Debtors' share of proceeds from the sale of Owned FF&E, after payment of Sterling's secured claim, except as otherwise agreed between Debtors and

Sterling in writing;

(vi) the Additional Agent's Goods Fee;

(vii) all of Agent's payments to Debtors under the Agency Agreement for Expenses paid by Debtors in accordance with the Budget; and

(viii) any payments received by Debtors from Corporate Partners II, Ltd. as approved by separate order of the Bankruptcy Court.

The payments from the Operating Account shall be in accordance with the Budget, subject to such variances as approved by Sterling in accordance with the DIP Order or other order of the Court. Furthermore, the Operating Account shall receive daily transfers from the Payroll Account, the Accounts Payable Account, and the Customer Refunds Account (all defined below). See Lopez Decl., ¶ 77.

12.    The third Union Bank Account is a payroll account, ending in 636 (the "Payroll Account"). Debtors transfer funds from the Operating Account to the Payroll Account to pay Debtors' employees. The Payroll Account is a "zero balance" account that automatically transfers all remaining funds to the Operating Account at the end of the day. See id. at ¶ 78.

13.    The fourth Union Bank Account is an accounts payable account, ending in 249 (the "A/P Account"). Debtors transfer funds from the Operating Account to A/P Account to pay Debtors' accounts payable. The A/P Account is also "zero balance" account that automatically transfers all remaining funds to the Operating Account at the end of the day. See id. at ¶ 79.

14.    The fifth Union Bank Account is a customer refund account, ending in 256 (the "C/R Account"). Debtors transfer funds from the Operating Account to C/R Account to pay customer refunds. Like the Payroll and A/P Accounts, the C/R Account is a "zero balance" account that automatically transfers all remaining funds to the Operating Account at the end of the day. It is not anticipated that the C/R Account will be used on a postpetition basis as the Agent will be handling refunds once the Agency Agreement is approved by the Court and Debtors will be reimbursing the Agent for these refunds postpetition from the Operating Account in accordance with the Agency Agreement. See id. at ¶ 80.

15.    The Bank Accounts tie into and provide data to Debtors' Accounting Systems

(defined hereinafter) to accurately record such collections, transfers, and disbursements as they are made.  See id. at ¶ 81.

16.    Specifically, Debtors utilize three (3) financial accounting software programs (together, the "Accounting Systems").  Debtors use Celerant, which is Debtors' point of sales software for the store in San Francisco, California.  Debtors also use Ecometry, which is a centralized Enterprise Resource Planning (like point of sale, but for e-commerce) that receives all transactional from the direct mail and web businesses.  Finally, Debtors use Multiview as their financial management software, which is essentially a general ledger and compiles all Debtors' financial data from Celerant and Ecometry.  See id. at ¶ 82.

17.    Additionally, Debtors have agreements with two (2) credit card processing companies – Litle & Co. and Vantiv/Paymentech (together, the "Credit Card Processors").  The Credit Card Processors deposit all credit card receivables (the "Credit Card Receivables") to the Collections Account.  See id. at ¶ 83.

18.    Postpetition, Debtors will open an additional account at Union Bank designated as the "Sales Tax Account" (the "Sales Tax Account") into which the Agent shall deposit all sales taxes collected by Agent in connection with sales under the Agency Agreement and from which account such sales tax shall be remitted to the appropriate governmental unit or taxing authority. At Debtors' option, Debtors may redesignate the C/R Account as the Sales Tax Account to be used in accordance with this paragraph.  See id. at ¶ 84.

## II.
## JURISDICTION AND VENUE

19.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Pursuant to Local Rule 9014.2, Debtors consent to entry of final order(s) or judgment(s) by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders for judgment consistent with Article III of the United States Constitution.

4847-4792-5614, v. 8

20.    The statutory basis for the Motion is Sections 105, 363(c)(1), 1107(a), and 1108, and Local Rule 4001(e).

21.    Debtors continue to operate their business and manage their property as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108.  No requests have been made for the appointment of a trustee or examiner, and no official committees have yet been established in the Chapter 11 Cases.

### III.
### REQUESTED RELIEF

22.    By this Motion, Debtors request that this Court grant the following relief:

a.    that Debtors are authorized and empowered to: (1) maintain their Cash Management System and continue to use all of their Bank Accounts in existence as of the Petition Date; (2) treat the Bank Accounts for all intents and purposes as debtor-in-possession accounts; (3) use, in their present form, existing checks and other documents related to the Bank Accounts; (4) pay prepetition and postpetition ordinary course bank fees in connection with the Bank Accounts; and (5) perform their obligations under the documents and agreements governing the Bank Accounts;

b.    that Debtors maintain records of all transfers and transactions within the Cash Management System so that all transfers and transactions are adequately and promptly documented in, and ascertainable and traceable from, Debtors' Accounting Systems;

c.    that all Banks at which Debtors maintains Bank Accounts are authorized and directed to: (1) continue to administer, service, and maintain the Bank Accounts as such accounts were administered, serviced, and maintained prior to the Petition Date without interruption and in the usual and ordinary course; and (2) pay any and all checks, drafts, wires, automated clearinghouse (ACH) transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank. Accounts (collectively, the "Debits") on account of a claim arising on or after the Petition Date so long as there are sufficient collected funds in the relevant Bank Accounts and in accordance with the agreements governing said Bank Accounts, including, without limitation, any prepetition cash management agreements, merchant service agreements, or treasury services agreements;

d.    that no Debits issued on the Bank Accounts prior to, but presented after, the commencement of Debtors' Chapter 11 Cases are honored or paid, other than the Permitted Checks (defined below) explicitly provided for herein, or as otherwise permitted by Court order after notice and a hearing;

e.    that the Banks are authorized to honor the 36 prepetition payroll checks issued by the Debtors to employees terminated on or before August 1, 2018 and 3 outstanding vendor payables checks, all as disclosed on Exhibit B to the DIP Order (the "Permitted Checks").  The Debtors will promptly provide the Bank with a list of the checks to be honored.  If an employee or vendor that was issued a Permitted Check

refuses or is otherwise unable to re-present the prepetition check for payment, the Debtors are authorized to issue a replacement check or cashier's check, as requested by such employee or vendor;

f.     that those certain existing deposit agreements between Debtors and their existing Banks shall continue to govern the postpetition cash management relationship between Debtors and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect;

g.     that, following Court approval of the Agency Agreement and commencement of the sale contemplated therein, the Debtors and the Banks may, without further order of this Court, agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts;

h.     that, following Court approval of the Agency Agreement and commencement of the sale contemplated therein, nothing contained in this Motion or its subsequent order may prevent Debtors from closing the Bank Accounts as they deem necessary and appropriate;

i.     that Debtors reimburse the Banks for any claim arising prior to or after the Petition Date in connection with Debits deposited with the Banks which have been dishonored or returned for insufficient funds in the applicable accounts;

j.     that each Bank that maintained one or more Bank Accounts implements reasonable handling procedures to effectuate the terms requested in this Motion. Debtors request that no Bank that implements such handling procedures be liable to Debtors or their estates, or otherwise held in violation of this Motion or its subsequent order, for honoring a prepetition Debit or other Debit: (1) at the direction of Debtors that such prepetition Debit or other Debit be honored; (2) in the good faith belief that the Court has authorized that such prepetition Debit or other Debit be honored; or (3) as a result of an innocent mistake made despite implementation of such handling procedures;

k.     that the relief, rights, and responsibilities requested herein and granted in the order are deemed to apply to any and all Bank Accounts maintained in Debtors' name;

l.     that, to the extent any other order (if any) is entered directing a Bank to honor Debits made, drawn, or issued in payment of prepetition claims, the obligation to honor such items are subject to the order granting this Motion and the DIP Order;

m.     that Debtors and the Banks are authorized and directed to continue to perform pursuant to the terms of any prepetition documents and agreements governing the Bank Accounts, except and to the extent otherwise directed by the terms of the order;

n.     that the Banks are authorized to continue offsetting any funds deposited in the Bank Accounts by Debtors to the extent necessary to cover any fees, charges, and assessments set forth or provided for in the agreements governing the Bank Accounts or as otherwise permitted in the ordinary course of business pursuant to the agreements governing the Bank Accounts;

o.      that Debtors and the Banks are authorized and directed to perform their obligations pursuant to the terms of the documents governing any corporate credit card program between Debtors and the Banks. Debtors seek authorization to do and perform all acts, to make, execute, and deliver all instruments and documents, and to pay fees, charges, and expenses which may be required or necessary for Debtors' performance under any corporate credit card program; and

p.      that, only after Court approval of the Agency Agreement and commencement of the sale contemplated therein, the Court prohibit the Prepetition Daily Sweep.

23.     Allowing Debtors to maintain their Cash Management System and Bank Accounts will help to ease the transition into chapter 11 and eliminate the administrative burden of opening new accounts.  Without the relief requested herein, pursuant to the U.S. Trustee's Guidelines, Debtors would be required to close their existing Bank Accounts, open new bank accounts at cooperating depositories and imprint checks with the "Debtor-in-Possession" label. Complying with such requirements will needlessly burden Debtors without a corresponding benefit to parties in interest.  See Lopez Decl., ¶ 85.

24.     Debtors' Cash Management System is an ordinary, usual, and important business practice.  The Cash Management System enables Debtors to maintain control over the receipt and disbursement of cash, and to generate timely and accurate financial information critical to managing Debtors' business during the pendency of the Chapter 11 Cases.  If these practices and procedures are disrupted, Debtors' effort to reorganize may be jeopardized.  See id. at ¶ 86.

25.     Debtors' Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity.  Many corporate enterprises use these cash management systems because such systems provide numerous benefits.  Among the most important of these benefits is the ability to control corporate funds and ensure cash availability, to reduce administrative expenses, and to have easy access to timely and accurate financial information.  See id. at ¶ 87.

26.     Establishing a new cash management system would entail significant delay and cost, particularly considering the Cash Management System's complexity and reliability.  At a minimum, substantial disruptions to Debtors' business would occur by, among other things, delaying collection and disbursement of the payments to vendors, lessees, employees, and

customers.  This would in turn harm stakeholder confidence, thus disrupting mutually beneficial relationships with trade creditors, customers, and employees, among others. Such a negative impact on Debtors' operations would hinder a successful reorganization.  See id. at ¶ 88.

27.    Maintaining the existing Cash Management System would not prejudice any party. Debtors will maintain strict records with respect to all transfers of cash so that they are able to readily account for all transactions.  Debtors' maintenance of their existing Cash Management System is not only of critical importance to Debtors' business operations but is also in the best interests of Debtors' estates and creditors.  See id. at ¶ 89.

**IV.**
**LEGAL ARGUMENT**

**A.    This Court has Authority to Grant the Relief Requested.**

Courts commonly approve a debtor's continued use of its prepetition cash management system, along with those related procedures and transactions used in the ordinary course of a debtor's business, particularly for a debtor with large and/or complex business operations. For example, in In re The Charter Co., 778 F.2d 617 (11th Cir. 1985), the bankruptcy court entered an order authorizing the debtor and 43 subsidiaries "to continue to consolidate the management of its cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors herein." Id. at 618.  The United States Court of Appeals for the Eleventh Circuit further ruled that authorizing the debtors to utilize their prepetition "routine cash management system" was "entirely consistent" with the provisions of the Bankruptcy Code, and in particular Section 363(c)(1) which allows a debtor-in-possession to "use property of the estate in the ordinary course of business without notice or a hearing." Id. at 621. See also In re UNR Indus. Inc., 46 B.R. 25, 27 (Bankr. N.D. Ill. 1984) (debtor utilized "a court-approved and common cash management system known as 'Zero Balance Account.'"); In re Baldwin-United Corp., 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987) (court noted that fierce hostility between the creditors therein even made difficult "seemingly simple matters such as [the debtor's] motion to continue existing bank accounts and cash management system . . ."). 

Indeed, the purpose of Section 363(c)(1) is to provide a debtor-in-possession with the

flexibility to engage in those ordinary course transactions necessary to operate its business without unnecessary oversight by its non-lender creditors or the court.  See In re Lavigne, 114 F.3d 379, 384 (2d Cir. 1997); In re Enron Corp., 2003 WL 1562202, *15 (Bankr. S.D.N.Y. 2003).  Included within the scope of Section 363(c)(1) is a debtor-in-possession's ability to continue "routine transactions" required by such debtor's cash management system.  See In re Amdura Corp., 75 F.3d 1447, 1453 (10th Cir. 1996).

Moreover, a court's power to approve the continuation of a debtor's cash management system is provided by the statutory authority of Section 105, which allows a court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code,]" as well as carry out the core general principles of equity that form the foundation of the Bankruptcy Code.  The authority for, and wisdom of, approving the continuation of a debtor's cash management system is so well established that courts generally enter orders approving the continuation of a debtor's cash management system at or shortly after the beginning of a bankruptcy case, and most parties rarely contest these orders.  See, e.g., In re Lehman Brothers Holdings, Inc., 2008 WL 4902202, *2 (Bankr. S.D.N.Y. 2008) (court authorized the debtor to continue using its prepetition cash management system and bank accounts pursuant to Sections 105(a) and 363(c)).  When motions or orders to continue the use of a debtor's cash management system are contested, bankruptcy courts simply make conditions or amendments to its orders based on the facts and concerns presented in the cases before them.  See, e.g., In re The Colad Group, Inc., 324 B.R. 208, 216-217 (Bankr. W.D.N.Y. 2005) (court granted the continued use of the debtor's cash management system "for reasons of convenience," but required that any reordered company checks indicate the debtor's status as a debtor-in- possession); In re Enron Corp., 279 B.R. 671, 692 (Bankr. S.D.N.Y. 2002) (court restricted some cash sweeps to non-debtor entities).

However, most reported decisions which refer to a debtor's cash management system simply approve of the continuance of that debtor's system; thus, the inclusion of such information typically serves as no more than background to the legal issues that will be explored later in the opinion.  See, e.g., In re Kindred Healthcare, Inc., 2003 WL 22327933, *1 (Bankr. D. Del. 2003) (court noted that on the petition date the debtor filed a motion for approval of its cash management

system which was granted); In re Interco, Inc., 130 B.R. 301 (Bankr. E.D. Mo. 1991) (order on motion to exempt debtor's foreign bank deposits from requirements of Section 345 referred to "Motion of Debtor and Debtor-in-Possession for Order Clarifying Order Authorizing Maintenance of Cash Management Systems and Continued Use of Certain Existing Bank Accounts, Investment and Deposit Guidelines and Certain Business Forms"); In re FRG, Inc., 107 B.R. 461, 465 (Bankr. S.D.N.Y. 1989) (order on motion to transfer venue referred to "Application for Order Authorizing Maintenance of Cash Management Systems").

Uncertainty and risk surround every Chapter 11 case. Included within this class of risks is a debtor-in-possession's struggle to maintain current operations. In the Chapter 11 Cases at bar, Debtors urgently require the continued use of its Cash Management System. Absent the Cash Management System, there is the possibility that Debtors' Chapter 11 Cases might founder and creditors and other stakeholders be injured needlessly. To avert this prospect, Debtors seek authority to continue the operation of their existing Cash Management System.

Numerous courts and this Court have recognized that strict enforcement of the U.S. Trustee's Guidelines is not always in the best interest of a debtor or its estate and have granted other debtors the same or similar relief to the relief requested herein. See, e.g., In re Turnberry/MGM Grand Towers, LLC, Case No. 15-13706 (Bankr. D. Nev. Sept. 21, 2015) [ECF No. 255]; In re Rodeo Creek Gold Inc., Case No. 13-50301 (Bankr. D. Nev. March 29, 2013) [ECF No. 284]; In re Auburn Dev. LLC, Case No. 11-51188 (Bankr. D. Nev. Apr. 14, 2011) [ECF No. 29]; In re Station Casinos, Inc., Case No. 09-52477 (Bankr D. Nev. July 28, 2009); In re Zante, Inc., Case No. 09-50746 (GWZ) (Bankr. D. Nev. Mar. 23, 2009) [ECF No. 36]; see also In re Charter Behavioral Health Systems, LLC, 292 B.R. 36, 41 (Bankr. D. Del. 2003) (allowing the debtor to continue to use its existing bank account without the necessity to close all prepetition accounts and open new postpetition accounts). Debtors submit that a similar waiver of the U.S. Trustee's Guidelines that would require Debtors to close their Bank Accounts and open new "Debtor-in-Possession" accounts is warranted in these Chapter 11 Cases.

**B.    Cause Exists to Authorize Debtors to Utilize Existing Bank Accounts.**

Integral to Debtors maintaining their Cash Management System is Debtors' continued

use of their existing Bank Accounts. As numerous courts have indicated, the Bankruptcy Code grants discretionary authority to a bankruptcy court to allow the continued use of bank accounts. See e.g., The Charter Co., 778 F.2d at 618 (court noted that the bankruptcy court authorized the debtors to maintain its existing bank accounts); In re Lorber Indus. of Cal., 373 B.R. 663, 665 (B.A.P. 9th Cir. 2007) (discussing that the bankruptcy court allowed the debtor to continue using its prepetition workers' compensation program bank account for the purposes of administering benefits); In re Grant Broad., Inc., 75 B.R. 819, 820 (E.D. Pa. 1987) (court noted an order by the bankruptcy court authorizing use of cash collateral and prepetition bank accounts); Charter Behavioral Health Sys., LLC, 292 B.R. at 41 (court allowed the debtor to continue to use its existing bank accounts without the necessity to close all prepetition accounts and open new postpetition accounts); In re Hechinger Inv. Co. of Del., Inc., 282 B.R. 149, 150 (Bankr. D. Del. 2002) (court entered an order on the petition date authorizing the debtor to continue to use its existing prepetition bank accounts); In re UAL Corp., 2002 WL 34344255, *1 (Bankr. N.D. Ill. 2002) (court authorized the debtors, within the reasonable exercise of their business judgment, to continue using all of their bank accounts in existence on the petition date); In re New York City Shoes, Inc., 78 B.R. 426, 427 (Bankr. E.D. Pa. 1987) (court approved of the debtor's continued routine deposits of postpetition funds into prepetition bank accounts).

Pursuant to U.S. Trustee Guideline 4.4.6,[6] a Chapter 11 debtor-in-possession must close its prepetition bank accounts and open new accounts.  This requirement is designed to: (1) provide a clear line of demarcation between prepetition and postpetition transactions and operations; and (2) block the inadvertent payment of prepetition claims through the payment of checks drawn prior to the commencement of a debtor's case. However, courts often deviate from the strict recommendations of Guideline 4.4.6 based upon the unique circumstances of each case and if doing so facilitates a debtor's successful reorganization.  See e.g., The Colad Group, Inc., 324 B.R. at 217; Charter Behavioral Health Sys., 292 B.R. at 41.

To require Debtors to close the Bank Accounts and to open new bank accounts would

---

[6] U.S. Trustee Guideline 4.4.6 provides, in general, that a "debtor shall close all financial accounts that existed before the Chapter 11 case and establish new debtor-in-possession accounts to be used for all transactions during the pendency of the case."

cause substantial disruption and delay in Debtors' ongoing operations and would materially and adversely affect Debtors' business. To avoid such problems and to ensure a smooth transition into Chapter 11, it is imperative that Debtors be permitted to continue using their Bank Accounts.

Debtors request that its Bank Accounts be deemed and designated as debtor-in-possession accounts, and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms (including checks) as during the prepetition period, be authorized, subject only to: (1) the requirements of the DIP Order and Budget and other orders of this Court; (2) designation of the Bank Accounts as debtor-in-possession accounts; and (3) a prohibition against honoring prepetition Debits other than the Permitted Checks, as discussed herein, unless (a) Debtors receive specific authorization from this Court and (b) Debtors have provided a list of such Debits to Sterling. Debtors will advise the Banks not to honor Debits issued prior to the commencement of this Chapter 11 Cases, except as authorized by this Court. By so advising the Banks, Debtors will have achieved the goals of the requirement that bank accounts be closed. That is, without disrupting Debtors' ongoing operations, Debtors will have (a) established a clear demarcation between prepetition and postpetition Debits; and (b) blocked the inadvertent payment of prepetition Debits.

The Court has the authority, under Section 105(a), to grant the relief requested by Debtors concerning their Bank Accounts; it is proper for this Court to grant such relief as it is in the best interests of Debtors' creditors and other stakeholders. Again, Section 105(a) provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Because the maintenance and continued use of the Bank Accounts is crucial to Debtors' Cash Management System, and ultimately their reorganization, this Court has the authority to order the relief sought herein by virtue of Section 105(a).

Because Debtors processes large amounts of cash and Credit Card Receivables on a daily basis to facilitate the unique needs of their business, any disruption to the Cash Management System or Bank Accounts would seriously and irreparably harm Debtors and their estates. Therefore, pursuant to Sections 105(a) and 363(c)(1), Debtors request that this Court's

authorization to continue the collection, concentration, and disbursement of cash in accordance with its existing Cash Management System, including the maintenance of its existing Bank Accounts.

**C.      The Requirements of Bankruptcy Rule 6003 Have Been Satisfied and Bankruptcy Rule 4004(h) is Properly Waived.**

Bankruptcy Rule 6003(b) provides "except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before filing of the petition. . . ."  As described above and in the First Day Declaration, if the Cash Management System or Bank Accounts are disrupted, Debtors will experience immediate and irreparable harm.  See Lopez Decl., ¶ 89.  To ensure Debtors' chances of successfully reorganizing and maximizing value for Debtors' estates and creditors, this Court should find that the exception set forth in Bankruptcy Rule 6003 applies in this Chapter 11 Cases.[7]

**V.**
**CONCLUSION**

WHEREFORE, Debtors respectfully request that the Court (a) enter an order substantially in the form attached hereto as **Exhibit 1** and (b) grant such additional relief as the Court deems just and proper.

DATED:  August 8, 2018.

GARMAN TURNER GORDON LLP


By: _/s/ William M. Noall_____
       WILLIAM M. NOALL
       GABRIELLE A. HAMM
       MARK M. WEISENMILLER
       650 White Drive, Suite 100
       Las Vegas, Nevada 89119
       *[Proposed] Attorneys for Debtor*

---

[7] To the extent any of the relief requested herein is not granted on the Petition Date, in the alternative, and out of an abundance of caution, Debtors request that the Court set a final hearing on any remaining matters on the earliest available date that is more than 21 days after the Petition Date pursuant to Rule 6003.

4847-4792-5614, v. 8

# EXHIBIT 1

# EXHIBIT 1

1

2

3

4

5

6

7   GARMAN TURNER GORDON LLP
    WILLIAM M. NOALL
8   Nevada Bar No. 3549
    E-mail:  wnoall@gtg.legal
9   GABRIELLE A. HAMM
    Nevada Bar No. 11588
10  E-mail:  ghamm@gtg.legal
    MARK M. WEISENMILLER
11  Nevada Bar No. 12128
    E-mail:  mweisenmiller@gtg.legal
12  650 White Drive, Suite 100
    Las Vegas, Nevada 89119
13  Telephone (725) 777-3000
    Facsimile (725) 777-3112
14  *[Proposed] Attorneys for Debtor*
15

16              **UNITED STATES BANKRUPTCY COURT**
                **FOR THE DISTRICT OF NEVADA**
17

18  In re:                          | Case No.: BK-S-18-14683-leb
                                     | Chapter 11
19  GUMP'S HOLDINGS, LLC,
                                     |
20          Debtor.                  | Joint administration requested
                                     |
21                                   |
                                     | Hearing Date:
22                                   | Hearing Time:
                                     | Location:
23  **ORDER AUTHORIZING MAINTENANCE OF PREPETITION CASH MANAGEMENT**
24  **SYSTEM AND BANK ACCOUNTS; AND GRANTING RELATED RELIEF**

25          Gump's  Holdings,  LLC,  Gump's  Corp.,  and  Gump's  By  Mail,  Inc.  (collectively,

26  "<u>Debtors</u>"),[1]  debtors  and  debtors-in-possession,  filed  their  *Motion  For  Order  Authorizing*

27  _____

28  [1] Contemporaneously herewith, each Debtor has filed an application for an order jointly-administering the Chapter 11 cases, with Gump's Holdings, LLC as the lead case.

GARMAN TURNER GORDON
Attorneys at Law
650 White Drive, Ste. 100
Las Vegas, NV 89119
725-777-3000

4846-6403-9534, v. 4

*Maintenance of Prepetition Cash Management System and Bank Accounts; and Granting Related Relief* [ECF No. ____] (the "<u>Motion</u>")[2] on August 8, 2018.

The Motion came on for hearing before the above-captioned Court and Debtors appeared by and through their proposed counsel, the law firm of Garman Turner Gordon LLP, and all other appearances were noted on the record. The Court reviewed the Motion and the other pleadings and papers on file and heard and considered the argument of counsel at the hearing on the Motion. It appearing that notice and an opportunity for a hearing on this Motion has been given and is appropriate under the circumstances surrounding these Chapter 11 Cases and that no other or further notice need be given; and it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and it appearing that venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** as follows:

1.      The Motion is granted in its entirety;

2.      Debtors are authorized and empowered to: (1) maintain their Cash Management System and continue to use all of their Bank Accounts in existence as of the Petition Date; (2) treat the Bank Accounts for all intents and purposes as debtor-in- possession accounts; (3) use, in their present form, existing checks and other documents related to the Bank Accounts; (4) pay prepetition and postpetition ordinary course bank fees in connection with the Bank Accounts; and (5) perform their obligations under the documents and agreements governing the Bank Accounts;

3.      Debtors maintain records of all transfers and transactions within the Cash Management System so that all transfers and transactions are adequately and promptly documented in, and ascertainable and traceable from, Debtors' Accounting Systems;

---

[2] All undefined, capitalized terms shall have the meaning ascribed to them in the Motion.

GARMAN TURNER GORDON
Attorneys at Law
650 White Drive, Ste. 100
Las Vegas, NV 89119
725-777-3000

4846-6403-9534, v. 4

4.    All Banks at which Debtors maintains Bank Accounts are authorized and directed to: (1) continue to administer, service, and maintain the Bank Accounts as such accounts were administered, serviced, and maintained prior to the Petition Date without interruption and in the usual and ordinary course; and (2) pay any and all checks, drafts, wires, automated clearinghouse (ACH) transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank. Accounts (collectively, the "Debits") on account of a claim arising on or after the Petition Date so long as there are sufficient collected funds in the relevant Bank Accounts and in accordance with the agreements governing said Bank Accounts, including, without limitation, any prepetition cash management agreements, merchant service agreements, or treasury services agreements;

5.    No Debits issued on the Bank Accounts prior to, but presented after, the commencement of Debtors' Chapter 11 Cases are honored or paid, other than the Permitted Checks (defined below) explicitly provided for herein, or as otherwise permitted by Court order after notice and a hearing;

6.    The Banks are authorized to honor the 36 prepetition payroll checks issued by the Debtors to employees terminated on or before August 1, 2018 and 3 outstanding vendor payables checks, all as disclosed on Exhibit B to the DIP Order (the "Permitted Checks"). The Debtors will promptly provide the Bank with a list of the checks to be honored. If an employee or vendor that was issued a Permitted Check refuses or is otherwise unable to re-present the prepetition check for payment, the Debtors are authorized to issue a replacement check or cashier's check, as requested by such employee or vendor;

7.    Those certain existing deposit agreements between Debtors and their existing Banks shall continue to govern the postpetition cash management relationship between Debtors and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect;

8.    Following Court approval of the Agency Agreement and commencement of the sale contemplated therein, the Debtors and the Banks may, without further order of this Court,

GARMAN TURNER GORDON
Attorneys at Law
650 White Drive, Ste. 100
Las Vegas, NV 89119
725-777-3000

3

4846-6403-9534, v. 4

agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts;

9. Following Court approval of the Agency Agreement and commencement of the sale contemplated therein, nothing contained in this Motion or its subsequent order may prevent Debtors from closing the Bank Accounts as they deem necessary and appropriate;

10. Debtors shall reimburse the Banks for any claim arising prior to or after the Petition Date in connection with Debits deposited with the Banks which have been dishonored or returned for insufficient funds in the applicable accounts;

11. Each Bank that maintained one or more Bank Accounts implements reasonable handling procedures to effectuate the terms requested in this Motion. Debtors request that no Bank that implements such handling procedures be liable to Debtors or their estates, or otherwise held in violation of this Motion or its subsequent order, for honoring a prepetition Debit or other Debit: (1) at the direction of Debtors that such prepetition Debit or other Debit be honored; (2) in the good faith belief that the Court has authorized that such prepetition Debit or other Debit be honored; or (3) as a result of an innocent mistake made despite implementation of such handling procedures;

12. The relief, rights, and responsibilities requested herein and granted in the order are deemed to apply to any and all Bank Accounts maintained in Debtors' name;

13. To the extent any other order (if any) is entered directing a Bank to honor Debits made, drawn, or issued in payment of prepetition claims, the obligation to honor such items are subject to the order granting this Motion and the DIP Order;

14. Debtors and the Banks are authorized and directed to continue to perform pursuant to the terms of any prepetition documents and agreements governing the Bank Accounts, except and to the extent otherwise directed by the terms of the order;

15. The Banks are authorized to continue offsetting any funds deposited in the Bank Accounts by Debtors to the extent necessary to cover any fees, charges, and assessments set forth or provided for in the agreements governing the Bank Accounts or as otherwise permitted in the ordinary course of business pursuant to the agreements governing the Bank Accounts;

**GARMAN TURNER GORDON**
Attorneys at Law
650 White Drive, Ste. 100
Las Vegas, NV 89119
725-777-3000

4

4846-6403-9534, v. 4

16.    Debtors and the Banks are authorized and directed to perform their obligations pursuant to the terms of the documents governing any corporate credit card program between Debtors and the Banks. Debtors seek authorization to do and perform all acts, to make, execute, and deliver all instruments and documents, and to pay fees, charges, and expenses which may be required or necessary for Debtors' performance under any corporate credit card program;

17.    After Court approval of the Agency Agreement and commencement of the sale contemplated therein, the Prepetition Daily Sweep shall be prohibited;

18.    Debtors are excepted from the operation of Rule 6003(b); and

19.    Any stay pursuant to Bankruptcy Rule 6004(h) or otherwise is hereby waived, and the terms and conditions of this order shall be immediately effective and enforceable upon its entry.

**IT IS SO ORDERED.**

Prepared and Submitted by:

GARMAN TURNER GORDON LLP

By: */s/Mark M. Weisenmiller*
    WILLIAM M. NOALL
    GABRIELLE A. HAMM
    MARK M. WEISENMILLER
    650 White Drive, Suite 100
    Las Vegas, Nevada 89119
    *[Proposed] Attorneys for Debtor*

**GARMAN TURNER GORDON**
Attorneys at Law
650 White Drive, Ste. 100
Las Vegas, NV 89119
725-777-3000

5

4846-6403-9534, v. 4

### LR 9021 CERTIFICATION

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

☐     The court waived the requirement of approval under LR 9021(b)(1).

☐     No party appeared at the hearing or filed an objection to the motion.

☐     I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated in the order.

☐     I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objection to the form or content of the order.

###

**GARMAN TURNER GORDON**
Attorneys at Law
650 White Drive, Ste. 100
Las Vegas, NV 89119
725-777-3000

6

4846-6403-9534, v. 4