GARMAN TURNER GORDON LLP
WILLIAM M. NOALL
Nevada Bar No. 3549
E-mail: wnoall@gtg.legal
GABRIELLE A. HAMM
Nevada Bar No. 11588
E-mail: ghamm@gtg.legal
MARK M. WEISENMILLER
Nevada Bar No. 12128
E-mail: mweisenmiller@gtg.legal
650 White Drive, Suite 100
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Debtors*

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF NEVADA

| In re: | Case No.: BK-S-18-14683-leb |
|---|---|
| GUMP'S HOLDINGS, LLC | Chapter 11 |
| ☐ Affects this Debtor. | *Jointly administered with*: |
| | No. BK-S-14684 (In re Gump's Corp.) |
| ☒ Affects all Debtors. | No. BK-S-14685 (In re Gump's By Mail, Inc.) |
| ☐ Affects Gump's Corp. | |
| ☐ Affects Gump's By Mail, Inc. | Hearing Date: **OST REQUESTED**<br>Hearing Time: **OST REQUESTED** |

# MOTION FOR ORDER APPROVING
# PAYMENT OF BONUSES TO MISSISSIPPI EMPLOYEES

Gump's Holdings, LLC, Gump's Corp., and Gump's By Mail, Inc. (collectively, "Debtors"), debtors and debtors-in-possession, hereby respectfully submit this motion (the "Motion") for entry of an order pursuant to Sections[1] 105(a), 363, 1107, and 1108 of the Bankruptcy Code and Bankruptcy Rule 6004 authorizing the Debtors to pay bonuses to certain employees.

---

[1] Unless otherwise stated, all references to "Section" herein shall be to title 11 of the U.S. Code (the "Bankruptcy Code"); all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all

This Motion is made and based upon the following Memorandum of Points and Authorities, the accompanying declarations of Tony Lopez (the "Lopez Declaration") and William M. Noall (the "Noall Declaration"), the August 9, 2018 declaration of Tony Lopez [ECF No. 38][2] (the "Closing Sale Declaration"), the papers and pleadings on file herein, judicial notice of which is hereby respectfully requested, and the argument of counsel entertained by the Court at the time of the hearings on the Motion.

## I.
## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1134 and Local Rule 1001(b)(1). Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 9014.2, the Debtors consent to entry of a final order or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders for judgment consistent with Article III of the U.S. Constitution.

2. Venue of the Debtors' chapter 11 cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory basis for the relief sought herein arises from Sections 105(a), 363, 1107 and 1108 of the Bankruptcy Code, and Bankruptcy Rule 6004.

## II.
## BACKGROUND

**A.    Debtors' Business and the Chapter 11 Cases.**

4. On August 3, 2018 (the "Petition Date"), each of the Debtors commenced a voluntary case under Chapter 11 of the Bankruptcy Code, commencing the chapter 11 cases (the "Chapter 11 Cases"). Contemporaneously with the filing of the voluntary petitions, Debtors filed an application for an order to jointly administer the Chapter 11 Cases, with Gump's Holdings, LLC denominated as the lead case.

---

references to a "Local Rule" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Nevada.

[2] All references to "ECF No." shall be to the docket in Gump's Holdings, LLC, Case No. 18-14683-leb, unless otherwise stated.

5. Established in 1861 by the Gump family as a frame and mirror shop, Gump's expanded its offerings in the late 19th century to sell moldings, gilded cornices, and European art to those made wealthy by the California Gold Rush and by the early 20th Century, had become an iconic retailer of distinctive luxury home furnishings and décor known for its fine art, jewelry, antiques, and personalized service. See Closing Sale Decl., ¶ 8.

6. Gump's is now comprised of two operating companies—Gump's Corp. and Gump's By Mail, Inc.—which are wholly owned by Gump's Holdings, LLC, a Nevada limited liability company. Gump's Corp. ("Retail") operates the flagship Gump's department store at 135 Post Street near Union Square in San Francisco, California, which also houses the Debtors' corporate offices (the "Store"). Gump's By Mail, Inc. ("Direct") operates the Debtors' distribution center (the "Distribution Center") in Olive Branch, Mississippi, which fulfills direct-to-consumer sales, including catalog and e-commerce sales, and delivers merchandise to the Retail store. In addition to the Store in San Francisco and the Distribution Center in Mississippi, Debtors hold certain furniture, fixtures, and equipment in a storage unit in Richmond, California. See id. at ¶¶ 9-10.

7. As described in the Closing Sale Declaration, the Debtors primarily operate the e-commerce and catalog platforms from the Distribution Center, which accounted for approximately 75% of the Debtors' sales in 2017. Moreover, a significant amount of the inventory to be sold during the Closing Sale, much of which must be packed and shipped to the retail store, is located in the Distribution Center. Therefore, the continued operation of the Distribution Center is integral to the Closing Sale. See id. at ¶ 56.

**B.    The Termination of the Distribution Center Employees.**

8. As more fully described in the Closing Sale Declaration, the Debtors faced an acute liquidity crisis by the end of June 2018, resulting in the need to conduct an orderly liquidation of their assets. Over the next few weeks, Debtors negotiated the terms of an agreement for the engagement of a joint venture between Hilco and Gordon Brothers (the "Agent") to conduct an orderly liquidation sale of Debtors' merchandise and fixtures (the "Agency Agreement"), along with the terms of postpetition (DIP) financing from its senior prepetition lender, Sterling Business Credit,

LLC ("Sterling") necessary to finance the Debtors' liquidation process. See Closing Sale Decl., ¶¶ 27-33.

9. However, before the Petition Date, the Debtors and Sterling reached an impasse in negotiations of the postpetition financing facility. Faced with being unable to fund payroll, on July 26 and 27, 2018, the Debtors' counsel contacted Sterling's counsel regarding implementation of a plan by Sterling to secure its collateral in connection with the Debtors' commencement of cases under Chapter 7 of the Bankruptcy Code. In response, Sterling initiated certain security measures at the Distribution Center on July 27, 2018 which involved the Olive Branch Police Department and an independent security company. Lopez Decl., ¶ 9.

10. On the evening of July 26, 2018 and morning of July 27, 2018, while awaiting authorizing resolutions for the commencement of Chapter 7 cases, the Debtors began the process of closing the Debtors' operations. See Lopez Decl., ¶ 10.

11. On July 26, 2018, Diana Holland-Cramer, the Debtors' then-Vice President of Store Operations and Human Resources, terminated the employees at the Distribution Center (the "Mississippi Employees"). See id.

12. On July 27, 2018, the Debtors and Sterling reached a preliminary agreement regarding the terms of an agreement for DIP financing, which was ultimately the subject of the DIP Financing Motion [ECF No. 36], and thereafter, the Debtors, the Agent, and Sterling reached the definitive terms of the Agency Agreement that was the subject of the Agent Retention Motion [ECF No. 35]. See id. at ¶ 11. Both the DIP Financing Motion and the Agent Retention Motion were approved on August 10, 2018. See *Order (A) Approving Agency Agreement, (B) Authorizing and Approving Store Closing Sale Free and Clear of all Liens, Claims, and Encumbrances, (C) Granting Liens, and (D) Granting Related Relief* [ECF No. 58] (the "Agency Order"); *Interim Order (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Granting Liens and Providing Administrative Expense Status, (C) Authorizing the Debtors' Use of Cash Collateral, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, and (F) Granting Related Relief* [ECF No. 60] (the "Interim DIP Order").

13. At some point on July 27, 2018, Laurel Varney, SVP at Sterling—without the Debtors' prior knowledge or agreement—contacted one or more of the Mississippi Employees and assured them that, given the circumstances of their termination on July 26, 2018 and the uncertainty regarding their tenure upon being re-hired, they would be paid a bonus. Moreover, without the Debtors' prior knowledge or consent, Ms. Varney apparently negotiated agreements with both the Olive Branch Police Department and the private security company to make donations of $2,500 to each of them with the Debtors' funds. See Lopez Decl. at ¶ 12.

14. On July 27, 2018, Sterling's counsel, orally and in writing, communicated to the Debtors' counsel that bonus payments equal to accrued PTO amounts had to be paid to the Mississippi Employees along with payments to the Olive Branch Police Department and the security company, and that such payment was a condition to the DIP financing. See Noall Decl., ¶ 3. No disclosure was made to Debtors' counsel about Ms. Varney's communication with the Debtors' employees regarding this issue. Rather, the Debtors' counsel understood that this was an arrangement made by Debtors' management in furtherance of the DIP Financing and therefore was concerned primarily with the amount of the payments and the impact on the Budget. Debtors' counsel never imagined that Sterling's representative would interfere with Debtors' employees or promise renumeration. See id. at ¶ 4.

15. Conversely, the Debtors (through Mr. Lopez) understood that these payments were for PTO due to employees who would be temporarily rehired but not retained for the term of the Closing Sale. The Debtors understood that while payment was termed a "bonus," it was in fact the payment of accrued PTO. Because the Debtors would not be able to explain to their employees why a few employees were being paid accrued PTO while the vast majority of other employees were not receiving such payments, the payments were characterized as bonuses to the Mississippi Employees and transition costs in the Budget. The Debtors also understood the payment of bonuses would reduce their accrued PTO obligation. Based on this understanding, the Debtors advised Debtors' counsel that the amounts to be paid would be approximately $5,000 to $6,000. The Debtors agreed to pay such amounts, as not only were the payments believed to be *de minimus* under the circumstances, but they were required by Sterling as a prerequisite to the DIP Financing

and to fund payroll for all of the Debtors' employees. See Lopez Decl., ¶ 13.

16.  In the Agent Retention Motion, the Debtors stated that the costs to rehire the terminated Mississippi Employees was an estimated $5,500, representing the accrued PTO for certain employees, and thereafter amended the Budget (attached to the DIP Financing Motion) to reflect that these employee obligations would total $6,190.[3] However, subsequent to entry of the Agency Order and Interim DIP Order, and despite failing to object to the amount set forth in either the Agent Retention Motion or the Budget, Sterling advised the Debtors that the Agent Retention Motion and the Budget did not reflect the total amount of the bonuses Sterling promised to the Mississippi Employees. See id. at ¶ 14.

17.  Rather, the Debtors learned, (i) Sterling promised the Mississippi Employees not merely a cash payment of accrued PTO to the employees who would be rehired and then terminated, as the Debtors previously understood and believed, but bonuses to *all* of the Mississippi Employees, including the facility manager (who had accrued PTO of $14,044.67) in an amount equal to each employee's accrued PTO (but not less than $350.00 for each employee), (ii) the bonuses would not offset accrued PTO obligations, but would be *in addition* to any payment such employees might otherwise be entitled to on account of their accrued PTO, and (iii) the total bonus payments would equal $25,427.65,[4] rather than the $6,190 reflected in the Budget, to be made from the financing described in the DIP Financing Motion. See id. at ¶ 15.

18.  None of the employees to be paid bonuses are officers, insiders, or persons in control of any of the Debtors. However, one of the Mississippi Employees, promised a bonus of

---

[3] See Agent Retention Motion, § IV.D.5; Interim DIP Order, Ex. A; see also Closing Sale Decl., ¶ 70.

[4] The required bonus payments to the Mississippi Employees are as follows (the "Mississippi Employee Obligations"):

| Employee No. 10  | $14,044.67 |
| Employee No. 32  | $350.00 |
| Employee No. 33  | $350.00 |
| Employee No. 63  | $350.00 |
| Employee No. 69  | $4,319.25 |
| Employee No. 78  | $350.00 |
| Employee No. 92  | $539.64 |
| Employee No. 101 | $3,531.59 |
| Employee No. 106 | $1,592.50 |

Id. at ¶ 16.

$14,044.67, is the manager of the Distribution Center. See id. at ¶ 17.

19. The Debtors' management is gravely concerned that payment of these bonuses to a small subset of the Debtors' employees, and particularly, the disproportionately-large bonus to the Distribution Center manager, will demoralize other employees whose services are vital to the continued administration of these Chapter 11 Cases (including retail-level personnel needed to conduct the Closing Sale and administrative personnel whose services are indispensable to the Debtors' compliance with the reporting obligations imposed Bankruptcy Code and the financial reporting required under the DIP Financing and the Agency Agreement), possibly resulting in the loss of these essential employees. Nonetheless, Sterling has required that the Debtors seek approval of the Mississippi Employee Obligations as a condition to the DIP Financing, and as a result, payment of the Mississippi Employee Obligations is in the best interests of the Debtors' estates, their creditors, and other parties in interest. See id. at ¶ 18.

### III.
### LEGAL ARGUMENT

**A.  Payment of the Bonuses is Governed by Sections 105(a), 363(b), 1107, and 1108, Rather Than Section 503(c).**

While the Debtors seek to pay the Mississippi Employees bonuses, the limitations on payment of certain bonuses set forth in Section 503(c) do not apply. Section 503(c) prohibits (1) "a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business" absent certain evidentiary findings, (2) a severance payment to an insider, and (3) "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition."  11 U.S.C. § 503(c)(1)-(3).

The Debtors are not proposing to pay any insider to remain with the Debtors' business, any severance to an insider, or any person hired after the Petition Date. However, to the extent the bonus payments are deemed "other transfers or obligations that are outside the ordinary course of business" within the meaning of subsection (3), the "facts and circumstances" language of Section 503(c)(3) has been determined by courts to create a standard no different than the business

judgment standard under Section 363(b). In re Borders Group, Inc., 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) (citations omitted); In re Glob. Home Products, LLC, 369 B.R. 778, 783 (Bankr. D. Del. 2007). As set forth below, the payments are justified by the facts and circumstances of the Chapter 11 Cases and the payments are a sound exercise of business judgment—satisfaction of the Mississippi Employee Obligations was and is a requirement for Sterling's provision of DIP Financing, and the currently-employed Mississippi Employees are necessary to the continued operation of the Distribution Center.

Section 363(b) permits a debtor to use, sell, or lease, estate property "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Courts generally require a debtor to demonstrate that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991) ("[D]ebtor in possession can sell property of the estate outside the ordinary course of business if . . . he has an 'articulated business justification.'"); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (authorizing sale of debtor's assets pursuant to section 363 "when a sound business purpose dictates such action") (citation omitted); Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).

Once the debtor has articulated a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company. See In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992). Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Agarwal v. Pomona Valley Med. Group, Inc. (In re Pomona Valley Med. Group, Inc.), 476 F.3d 665, 670 (9th Cir. 2007); In re Chi-Feng Huang, 23 B.R. 798, 801 (B.A.P. 9th Cir. 1982); Pacific Shores Development, LLC v. At Home Corp. (In re At Home Corp.), 292 B.R. 195, 199 (N.D. Cal. 2003); In re Johns-Manville Corp., 60 B.R. 612,

616 (Bankr. S.D.N.Y. 1986). The business judgment rule shields a debtor's management from judicial second-guessing. See Integrated Res., 147 B.R. at 656; Johns-Manville, 60 B.R. at 615–16 (noting that "the Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Thus, if a debtor's actions satisfy the business judgment rule, the actions in question should be approved under section 363(b)(1).

B.  **Payment of the Employee Bonuses is Appropriate and Authorized Under Sections 105(a) and 363(b) of the Bankruptcy Code.**

Courts have held that, pursuant to Sections 105(a)[5] and 363(b) and consistent with the debtor's fiduciary obligations under Sections 1107(a) and 1108, it is appropriate to authorize the payment of prepetition obligations where necessary to the debtors' rehabilitation or to protect and preserve the estate. See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to justify payment of prepetition wages); Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.), 29 B.R. 391, 397-98 (S.D.N.Y. 1983) (relying on Section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); see also In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing that there are instances where the debtor can fulfill its fiduciary duty to protect and preserve the estate "only . . . by the preplan satisfaction of a prepetition claim.")

This "doctrine of necessity" has been judicially recognized in the Ninth Circuit. See In re Hines, 147 F.3d 1185, 1191 (9th Cir. 1998); Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation . . ." is appropriate); In re Berry Good, LLC, 400 B.R. 741, 746 (Bankr. D. Ariz. 2008).

---

[5] Section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

The rationale for the necessity of payment rule—that is, the rehabilitation of a debtor in a reorganization case—is "the paramount policy and goal of Chapter 11." Ionosphere Clubs, 98 B.R. at 175-76; see also, e.g., In re Just For Feet, 242 B.R. 821, 824-25 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 3 Collier on Bankruptcy, 105.02[4][a] (16th ed. rev. 2011) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

To that end, courts have permitted postpetition payment of prepetition claims pursuant to Section 105(a) in situations such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtor's reorganization. See In re UNR Indus., 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992); Ionosphere Clubs, 98 B.R. at 177; In re Structurlite Plastics Corp., 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ( "a bankruptcy court may exercise its equity powers under § 105(a) to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'"

To facilitate implementation of the Agency Agreement and the administration of the estate during the Chapter 11 Cases, the Debtors require the continued services of the rehired Mississippi employees, who may not have agreed to continue employment with the Debtors after the abrupt shut-down of the Distribution Center without the promise of payment of the bonuses. Failure to honor these payments will result in discontent, likely resulting in the loss of such employees. More

Garman Turner Gordon
650 White Dr., Suite 100
Las Vegas, Nevada 89119
(725) 777-3000

significantly, the Debtors must comply with Sterling's requirements to maintain the availability of the DIP Financing, including payment of the bonuses to the Mississippi Employees.  Accordingly, Debtors submit that payment of the Mississippi Employee Obligations is in the best interests of the Debtors' estates, their creditors, and other parties in interest.  See Lopez Decl., ¶ 19.

## IV.
## WAIVER OF THE STAY IS WARRANTED

The Debtors request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  The Mississippi Employees were promised bonuses on or about July 27th, and expected payment immediately following entry of the Interim DIP Order on August 10th.  Any further delay in payment is likely to result in loss of the employees and the critical services they provide and jeopardizes the Debtors' access to further DIP Financing.  Lopez Decl., ¶ 20.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## V.
## CONCLUSION

WHEREFORE, the Debtors respectfully request an order authorizing the Debtors to pay the Mississippi Employee Obligations described herein, waiving the 14-day stay, and granting such other and further relief as is just and equitable.

DATED:  September 6, 2018.

GARMAN TURNER GORDON LLP

By: */s/ William M. Noall*
WILLIAM M. NOALL
GABRIELLE A. HAMM
MARK M. WEISENMILLER
650 White Drive, Suite 100
Las Vegas, Nevada 89119
*Attorneys for Debtors*